RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2001 FED App. 0265P (6th Cir.)
File Name: 01a0265p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————

GEORGE NICHOLS, III, in his
capacity as Liquidator of
Kentucky Central Life
Insurance Company,
      *Plaintiff-Appellant,*

    *v.*

UNITED STATES OF AMERICA,
      *Defendant-Appellee.*

No. 99-5580

Appeal from the United States District Court
for the Eastern District of Kentucky at Lexington.
No. 97-00186—Karl S. Forester, Chief District Judge.

Argued: June 8, 2001

Decided and Filed: August 13, 2001

Before: KENNEDY, SILER, and CLAY, Circuit Judges.

———————

**COUNSEL**

**ARGUED:** W. Bradford Boone, STITES & HARBISON,
Lexington, Kentucky, for Appellant. Steven W. Parks,
UNITED STATES DEPARTMENT OF JUSTICE,
APPELLATE SECTION TAX DIVISION, Washington, D.C.,

1

for Appellee. **ON BRIEF:** W. Bradford Boone, Gregory P. Parsons, STITES & HARBISON, Lexington, Kentucky, for Appellant.　Steven W. Parks, UNITED STATES DEPARTMENT OF JUSTICE, APPELLATE SECTION TAX DIVISION, Washington, D.C., for Appellee.

―――――――

## OPINION

―――――――

CLAY, Circuit Judge.　Plaintiff, George Nichols, III, the state-appointed liquidator for Kentucky Central Life Insurance Company ("KCL"), filed a complaint in the United States District Court for the Eastern District of Kentucky alleging that the Internal Revenue Service (IRS) owed KCL income tax refunds totaling $18,502,455 plus interest for the taxable years 1989, 1990, and 1991.　Plaintiff claimed that losses incurred during the taxable years 1992 and 1993 by KCL's life insurance company, losses which KCL sought to carry back to the income of its nonlife insurance company affiliate groups, reduced its taxable income on its consolidated tax returns for 1989 through 1991.　Under Treas. Reg. § 1.1502-47(a)(2)(ii) (the "anti-carryback regulation"), which prohibits KCL from carrying back losses from its life subgroup to its non-life subgroup, KCL would not be entitled to an income tax refund.　Plaintiff argued, however, that the anti-carryback regulation is an invalid exercise of the Secretary of the Treasury's power to promulgate consolidated tax return regulations and is thus void.　Rejecting Plaintiff's argument, the district court granted summary judgment to the government and denied Plaintiff's motion to alter or amend the grant of summary judgment.　Plaintiff now appeals.　For the reasons that follow, we **AFFIRM** the district court's orders granting summary judgment to the government and denying Plaintiff's motion to alter or amend.

requires the offset [the taxpayer] seeks." *Id.*　The court concluded,

> [t]he overriding determinant is that the Commissioner's regulation is authorized by the statute, and his interpretation of that regulation is not so unreasonable as to be declared invalid by this court on policy grounds. That is not our function or our decision.　As the Supreme Court has emphasized, "[w]hen Congress . . . has delegated policymaking authority to an administrative agency, the extent of judicial review of the agency's policy determination is limited."

*Id.* at 149 (citation omitted).

We likewise reject Plaintiff's fairness argument in this case. While Plaintiff's argument is understandable, equity and policy arguments are insufficient to invalidate a regulation that is otherwise properly enacted pursuant to the Secretary's power under sections 1502 and 1503. *See Conn. Gen.*, 177 F.3d at 148-49.　Inasmuch as the anti-carryback regulation is neither arbitrary, capricious nor manifestly contrary to the Tax Reform Act, Plaintiff's equity and policy argument must fail.

## CONCLUSION

The Secretary did not exceed the authority given to him in sections 1502 and 1503 in enacting the anti-carryback regulation.　The regulation is not contrary to the Tax Reform Act, its legislative history, or its purpose, and is a reasonable interpretation and implementation of the Act.　The anti-carryback regulation is therefore controlling.　Accordingly, we **AFFIRM** the district court's order granting summary judgment to the government and the order denying Plaintiff's motion to alter or amend the judgment.

as that in *American Standard* where the regulation results in the taxation of income that would not otherwise be taxed. Because there is no provision in the Code authorizing the deduction Plaintiff urges in this case, the income Plaintiff seeks to offset would otherwise be taxed. As this Court recognized in *Wolter*, deductions are a matter of legislative grace and should therefore be narrowly construed; "only as there is a clear provision therefore can any particular deduction be allowed." 634 F.2d at 1039. In the instant case, the anti-carryback regulation, enacted pursuant to Congressional authority, expressly prohibits the deduction Plaintiff seeks; "conspicuously absent from the Code is any clear provision which allows the deduction . . . ." *Id.* Absent such a provision allowing the deduction, the anti-carryback regulation is a valid exercise of the Secretary's regulatory authority under sections 1502 and 1503.

Plaintiff's overarching argument in this case is that it would be unfair and inequitable to tax KCL in the instant case because KCL and its affiliated group did not actually realize consolidated income. A similar argument was rejected by the court in *Connecticut General*, which, like this case, involved the validity of a regulation governing consolidated tax returns. The regulation at issue in that case resulted from Congress' enactment of a provision of the Tax Reform Act, 26 U.S.C. § 1503(c)(2), which requires that a company belong to a group for at least five years before it is treated as affiliated therewith. *Connecticut General*, 177 F.3d at 138. The court rejected the taxpayer's argument that the regulation was arbitrary, capricious, and unreasonable. *Id.* at 148-49. The taxpayer argued that the regulation as interpreted was unreasonable and unfair because it required that the income of profitable members of the acquired group be taken into account, but not the loss of the acquired group. *Id.* at 148. The court rejected this argument, reasoning that "[t]he simple answer, obviously unsatisfactory to [the taxpayer], is that the Commissioner, who has the delegated authority to promulgate legislative regulations did not provide for initial offsets within the group. And there is no language in the statute that

## BACKGROUND

KCL is a life insurance company organized under the laws of Kentucky with its principal place of business in Lexington, Kentucky. KCL is the common parent of an affiliated group of corporations that includes insurance companies that are not life insurances companies ("nonlife companies" or "nonlife insurance companies"). After a series of financial setbacks, on August 18, 1994, KCL was placed into liquidation by the Franklin Circuit Court in Frankfort, Kentucky. The court appointed the Kentucky Commissioner of Insurance as the liquidator. Plaintiff is Kentucky's current Commissioner of Insurance.

KCL filed consolidated tax returns in the years preceding its liquidation. KCL, along with its affiliated group of corporations, reported its income and losses as follows on its consolidated income tax returns for the years 1989 through 1993.

| Year | Life Subgroup | Nonlife Subgroup | Total |
|------|------|------|------|
| 1989 | ($2,210,059) | $26,318,335 | $24,108,276 |
| 1990 | (17,017,595) | 18,572,183 | 1,554,588 |
| 1991 | 35,986,616 | 55,787,879 | 91,032,938 |
| 1992 | (57,762,953) | (5,778,174) | (63,541,127) |
| 1993 | (53,248,866) | 2,628,602 | (50,620,264) |

KCL filed the above income tax returns in accordance with the anti-carryback regulation which prohibits the carryback of losses in life-nonlife consolidated tax returns from one subgroup to another subgroup. The regulation adopts a subgroup method, providing one subgroup for life insurance companies and another subgroup for nonlife insurance

companies.   In calculating the loss of a subgroup, the regulation provides as follows:

> one subgroup's loss must first be carried back against income of the same subgroup before it may be used as a setoff against the second subgroup income in the taxable year the loss arose.  (See section 1503(c)(1)).   The carryback of the losses from one subgroup may not be used to offset income of the other subgroup in the year to which the loss is to be carried.  This carryback of the first subgroup's loss may "bump" the second subgroup's loss that in effect previously reduced the income of the first subgroup.  The second subgroup's loss that is bumped in appropriate cases may in effect reduce a succeeding year's income of the second or first subgroup.  This approach gives the group the tax savings of the use of losses but the bumping rules assures that insofar as possible life deductions will be matched against life income and nonlife deductions against nonlife income.

Treas. Reg. § 1.1502-47(a)(2)(ii).  In other words, under this regulation, KCL could not use the losses of its life subgroup in 1992 and 1993 to offset the income of its nonlife subgroup in 1989, 1990, and 1991.

However, on September 13, 1996, Plaintiff sought to do exactly what is prohibited under the anti-carryback regulation.  On KCL's behalf, Plaintiff filed timely claims with the Internal Revenue Service ("IRS") seeking refunds for the tax years 1989, 1990 and 1991.  While Plaintiff acknowledged the ban on the carryback of losses across subgroups, Plaintiff nevertheless argued that the regulation contravened the intentions of Congress in enacting the Tax Reform Act of 1976 (hereinafter the "Act" or the "Tax Reform Act") and was therefore invalid.  In KCL's claims for refunds, Plaintiff attempted to carryback life losses from 1992 and 1993 against nonlife income for 1989, 1990, and 1991.  Plaintiff claimed that KCL was due refunds for taxable years 1989, 1990, 1991 of $5,540,246, $2,964,978 and $9,997,231, respectively.

carrying forward and carrying back losses was arguably created by Congress.  The Secretary simply extended the policy to the area of consolidated tax returns in accordance with his authority under section 1502 and section 1503 of the Code.  Plaintiff's argument that the anti-carryback regulation does not serve to prevent tax avoidance is not persuasive.

Plaintiff next relies on the decision in *American Standard, Inc. v. United States*, 602 F.2d 256 (Cl. Ct. 1979), where the court held that a treasury regulation preventing the deduction of certain income was invalid inasmuch as the Secretary acted outside of the authority granted him in section 1502.  In *American Standard*, Congress had expressly authorized a deduction of losses for Western Hemisphere Trade Corporations (WHTC) to promote American business within the Western Hemisphere. *Id.* at 265.  Purportedly pursuant to its authority under section 1502 to adopt regulations governing consolidated returns, the Secretary enacted Treas. Reg. § 1.1502-25, which effectively prohibited the deduction. *Id.* at 259.  The court held that the regulation was arbitrary and unreasonable because it was in direct contravention to the deduction allowed by Congress in section 922.  *Id.* at 265.  The court stated,

> [t]hough there may be many reasonable methods to determine a group's tax liability and the Secretary's authority is absolute when it represents a choice between such methods, [§ 1502] does not authorize the Secretary to choose a method that imposes a tax on income that would not otherwise be taxed.

*Id.* at 261.

Plaintiff's reliance on *American Standard* is misplaced; *American Standard* is clearly distinguishable from the case at bar.  Here, unlike *American Standard*, there is no express authorization in the Code or elsewhere for the deduction that is prohibited by the anti-carryback regulation.  Moreover, there is no indication that Congress intended that life companies be allowed to carry back losses to nonlife income.  In addition, the instant case does not present a situation such

reduced by the carry back of the $100 loss from 1992) even though the life company had no net income over the period from 1990 to 1992.

Appellee's Br. at 28-29 (emphasis in original). The government also argues that allowing the carryback of losses across subgroups would also distort income in other respects. Particularly, the government argues that,

> [u]nder the "bumping" rules, a loss of a life company that is applied against *current* nonlife income is eliminated (bumped back to the life column) if the nonlife company later realizes a loss of its own that it may carry back and apply against such income. Losses of nonlife companies, however, may only be carried back only three (not two) years (I.R.C. § 172(b)). Thus, if a loss of a life company is *initially* carried back three years and applied against income of a nonlife company, the bumping rules could not function effectively, because a loss of a nonlife company in the following year could be carried back only three years from that later year, and thus could be carried back to the years in which the loss of the life company was applied.

Appellee's Br. at 29 (emphasis in original).

Plaintiff has failed to demonstrate that these situations in which tax avoidance would be prevented by the anti-carryback regulation are in fact unreasonable or untrue. Plaintiff only argues that the rationale offered by the government is equally applicable to the carryforward of losses and thus the distinction between carrying back losses and carrying forward losses across subgroups is unreasonable. Plaintiff's argument, however, neglects to consider the framework in which the Secretary created the regulation. Whereas there is a clear prohibition against life insurance companies carrying back losses to a year when it was not a life insurance company, *see Inter-American*, 56 T.C. at 510-11, Congress expressly allows life insurance companies to carryforward losses to year when it was not a life insurance company, *see* 26 U.S.C. § 844. The distinction between

Within six months of filing its claims for refunds and without response from the government, Plaintiff filed the instant action seeking a total refund of $18,502,455 plus interest. The parties filed joint stipulations of facts and cross-motions for summary judgment. On July 17, 1998, the district court granted the government's motion for summary judgment but denied Plaintiff's motion for summary judgment.

On July 30, 1998, Plaintiff filed a motion to alter or amend the district court's order and judgment granting summary judgment to the government. The district court denied Plaintiff's motion to alter or amend on March 10, 1999.

Plaintiff filed a timely notice of appeal on April 27, 1999 appealing both the March 10, 1999 order and the July 17, 1998 order of the district court.

## STANDARD OF REVIEW

We review *de novo* the district court's order granting summary judgment to the government and its subsequent order denying Plaintiff's motion to alter or amend the judgment. *Smith v. Wal-Mart Stores, Inc.*, 167 F.3d 286, 289 (6th Cir. 1999); *Wilkins v. Baptist Healthcare Sys., Inc.*, 150 F.3d 609, 613 (6th Cir. 1998). Summary judgment is appropriate where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c).

Furthermore, whether the anti-carryback regulation is a valid exercise of the Secretary's power is a question of law. Questions of law, of course, are subject to *de novo* review. *United States v. Jackson*, 181 F.3d 740, 743 (6th Cir. 1999); *United States v. Knipp*, 963 F.2d 839, 843 (6th Cir. 1992).

## DISCUSSION

On appeal, Plaintiff argues that the district court erred in granting summary judgment to the government on Plaintiff's claim seeking income tax refunds on behalf of KCL. Whether

KCL is entitled to the income tax refunds claimed in the complaint turns on its ability to carryback losses from its life subgroup for the years 1992 and 1993 to the income of its nonlife subgroup for the years 1989-1991. The anti-carryback regulation, however, prohibits carrybacks between life and nonlife subgroups. Pursuant to the anti-carryback regulation, KCL would not be entitled to the refunds Plaintiff now seeks. Plaintiff nevertheless argues that KCL is entitled to income tax refunds because the anti-carryback regulation is an invalid exercise of the Secretary's power to make regulations because it contravenes the Tax Reform Act, § 1507, 26 U.S.C. § 1504(c)(2)(A).

We disagree. A review of the law, the Tax Reform Act, the legislative history of the Act, and the facts make clear that, when issuing the anti-carryback regulation, the Secretary acted within his authority under sections 1502 and 1503(c)(1) to create consolidated tax return regulations. The district court therefore properly concluded that the anti-carryback regulation is not arbitrary, capricious, or manifestly contrary to the Tax Reform Act.

## I.

Prior to 1976 and the Tax Reform Act, nonlife insurance companies were prohibited from filing consolidated tax returns with affiliated life insurance companies. S. Rep. No. 94-938 (Part I), at 454 (1976), *reprinted in* 1976 U.S.C.C.A.N. 3438, 3881. This prohibition was aimed at ensuring that life companies were taxed on an amount approximately equal to their taxable investment income. *Id.* Congress, however, noted that a recession and inflation in prices had caused casualty insurance companies to incur large losses. *Id.* Whereas casualty insurance companies that were affiliated with nonlife insurance companies were permitted to file consolidated tax returns to offset their losses, casualty insurance companies that were affiliated with life insurance companies were not allowed to file consolidated income tax returns. *Id.* Recognizing that the ban on life-nonlife consolidated tax returns "ha[d] been a hardship for casualty

from being artificially high.[6] To illustrate its point, the government presented the following:

For example, assume the following income and loss figures for life and nonlife companies:

|  | Life | Nonlife |
|---|---|---|
| 1990 | $0 | $100 |
| 1991 | 100 | 0 |
| 1992 | (100) | 0 |

Assume that, at the beginning of 1990, the life company had a [policyholder's surplus account (PSA)] of $100 and a [shareholder surplus account (SSA)] of zero. If the life company's 1992 loss is carried back and allowed to offset *nonlife* income of $100 in 1990, the life company's 1991 income will be $100, rather than zero, as it would be if the $100 loss realized in 1992 were applied against the life company's 1991 income. The life company could then make a $100 distribution to its shareholders without being taxed because its SSA would have been increased by the $100 of 1991 income (and would not be

---

[6]Under the Code, stock life insurance companies are required to maintain two special surplus accounts for federal income tax purposes, a shareholders surplus account and a policyholders surplus account. *Digital Daily*, *Tax Professional's Corner*, Handbook 4.4.2, Ch. 5.11(1999) (an internet publication of the Internal Revenue Service). The purpose of the two separate accounts is to establish proper income tax treatment of shareholder distributions afforded life insurance companies. *Id.* Whereas policyholders surplus accounts are subject to income tax, no tax is imposed on the life insurance company with respect to distributions made from the shareholders surplus account. *Id.* "Under the general rule, distributions to shareholders are treated as first being made from the shareholders surplus account. Once this account has been reduced to zero, distributions are then considered to be made from the policyholders surplus account until this account is exhausted . . . ." *Id.*

**C.**

Plaintiff makes several arguments, which he claims demonstrate that the anti-carryback regulation is invalid. Plaintiff's primary argument is that the rationales offered by the Secretary in the preamble to the anti-carryback regulation do not support the regulation and the Secretary's interpretation of the Tax Reform Act. Inasmuch as we have previously concluded that the anti-carryback regulation is a reasonable interpretation and implementation of the Tax Reform Act and is supported by the case law and provisions of the Code cited by the government, Plaintiff's argument must fail.

Plaintiff also argues that the anti-carryback regulation does not fall within the confines of section 1502 because the regulation serves no tax avoidance purpose generally and specifically in this case. In the first instance, Plaintiff's tax avoidance argument is meritless insofar as he contends that the anti-carryback regulation is invalid because there is no evidence of tax avoidance in this case. The validity of the anti-carryback regulation does not turn on whether it operates fairly and perfectly in every single instance. *See United States v. Brockamp*, 519 U.S. 347, 352 (1997) ("Tax law, after all, is not normally characterized by case-specific exceptions reflecting individualized equities.").

Secondly, the government has supported its argument that the regulation operates to prevent tax avoidance and properly reflect income. The government argues that the anti-carryback regulation prevents shareholders surplus accounts

companies which are affiliated with life companies," Congress enacted the Tax Reform Act of 1976. *Id.*

The Tax Reform Act eliminated the ban on life-nonlife consolidated tax returns. The Act allowed life and nonlife companies that were affiliated to file consolidated tax returns in order to "provide[] substantial relief in the future for casualty insurance companies with losses," while at the same time, "preserv[ing] the concept sought by Congress in the past to the effect that some tax will be paid with respect to the life insurance company's investment income." S. Rep. No. 94-938 (Part I), at 455, *reprinted in* 1976 U.S.C.C.A.N. at 3881-82.

The Act, however, placed two restrictions on the application of losses from nonlife companies to the income of life companies. First, the Act prohibits the carryback of nonlife losses against life income. *See* 26 U.S.C. § 1503(c)(1). Second, the Act provides that in order to take advantage of the losses of a subgroup--either as a carryback, carryover, or for the current taxable year--the subgroup must be a member of the affiliated group five or more years. *See* 26 U.S.C. § 1503(c)(2). Except for these express restrictions, "the details of the computation of the tax liability of an affiliated group which includes life or other mutual insurance companies is [*sic*] to be determined under regulations issued by the Treasury Department." S. Rep. No. 94-938 (Part I), at 456, *reprinted in* 1976 U.S.C.C.A.N. at 3883.

Sections 1502 and 1503 of the Tax Code provide the Secretary with the authority to establish regulations in the area of consolidated returns. Section 1502 provides:

> The Secretary shall prescribe such regulations as he may deem necessary in order that the tax liability of any affiliated group of corporations making a consolidated return and of each corporation in the group, both during and after the period of affiliation, may be returned, determined, computed, assessed, collected, adjusted, in such manner as clearly to reflect the income-tax liability and the various factors necessary for the determination of

such liability, and in order to prevent avoidance of such tax liability.

26 U.S.C. § 1502.  Section 1503 further provides:

> In any case in which a consolidated return is made or is required to be made, the tax shall be determined, computed, assessed, collected, and adjusted in accordance with the regulations under section 1502 prescribed before the last day prescribed by law for the filing of such return.

26 U.S.C. § 1503.

Pursuant to his authority under the Code, the Secretary issued the anti-carryback regulation.  The anti-carryback regulation provided that, *inter alia*, "[a] loss (whether capital or operating) generated by one subgroup can never be carried back against the income of the second subgroup (cross-subgroup carryback).  The rule applies to both life and nonlife losses." Filing of Life-Nonlife Consolidated Returns, 48 Fed. Reg. 11436, 11439 (Mar. 18, 1983).  In the preamble to the regulations, the Secretary explained,

> [t]he proposed regulations prohibit the carryback of one subgroup's losses, whether capital or operating, for use against the income of the other subgroup.  This is referred to as a prohibition on cross-subgroup carrybacks.

All taxpayers agree that section 1503(c)(1) prohibits the cross-subgroup carryback of nonlife consolidated net operating losses for use against life income.  However, they argue for life loss from operations and net capital loss (whether life or nonlife) cross-subgroup carrybacks. The discussion is better broken into two categories--life losses from operations and net capital losses.

The Tax Court held that a single life company may not carry its loss from operations back for use against its own taxable income in years in which it did not qualify as a life company (*Inter-American Life Ins. Co.*, 56 T.C. 497 (1971), *aff'd*, 469 F.2d 697 (9th Cir. 1972)).  The court based its conclusion on the Internal Revenue Code.  *See*

The Secretary's interpretation of the statute is also supported by subsequent action by Congress.  After reviewing the regulations in their proposed form, Congress thought further research was necessary on one particular provision and therefore delayed implementation of that regulation; however, Congress allowed the other regulations, including the anti-carryback regulation, to be  enacted as proposed by the Secretary.  *See* TEFRA, Pub. L. No. 97-248, §§ 262, 263(a), 96 Stat. 324, 540; S. Rep. No. 494.

> Congress, of course, is not required to act each time a statute is interpreted erroneously and legislative silence in the face of such interpretation is not necessarily equivalent to legislative approval.  However, a consistent administrative interpretation of a statute, shown clearly to have been brought to the attention of Congress and not changed by it, is almost conclusive evidence that the interpretation has congressional approval.

*Kay v. FCC*, 443 F.2d 638, 646-47 (D.C. Cir. 1970).  Here, Congress implicitly approved the regulations enacted by the Secretary by only acting to delay implementation of one provision while allowing the other provisions including the anti-carryback regulation to go forward.  *Cf. Long v. United States*, 652 F.2d 675, 682 (6th Cir. 1981) ("Regulations of longstanding under Code section which Congress has thereafter frequently amended may be viewed as reflecting the approval of Congress.") (citing *Lykes v. United States*, 343 U.S. 118 (1952)).

---

and nonlife companies that seek to carryback losses against life income would be prohibited from doing so, life insurance companies seeking to carryback life losses against nonlife income would receive the benefit of the deduction.  Such a benefit would appear to be unintended and unwarranted given that others similarly situated could not take advantage of the deduction, including the intended beneficiary of the Tax Reform Act.

nonlife consolidated net operating loss for use against another company's life taxable income.

Filing of Life-Nonlife Consolidated Returns, 48 Fed. Reg. at 11,440.  The government now argues that,

> it would have been highly anomalous for Congress, or the Secretary in his consolidated tax returns regulations, to permit the carryback and application of *life* company losses against a prior year's income of *nonlife* members because, under the law in existence at the time the 1976 Act was enacted, life members *themselves* could not carry back and apply such losses against *their own* prior years' income on separate returns if they had not qualified as life companies in the prior year.  *Inter-American Life*; *see also* I.R.C. § 844.

Appellee's Br. at 24.

"Our rule 'in cases of this sort begins and ends with assuring that the Commissioner's regulations fall within his authority to implement the Congressional mandate in some reasonable manner.'"  *Wolter*, 634 F.2d at 1044 (citation omitted).    Here, the Secretary's interpretation and implementation of the Tax Reform Act are well-supported and reasonable.  Contrary to what Plaintiff would have this Court believe, there appears to be a history of disallowing a single life  insurance company to carry its life losses back to a year when the company was not a life insurance company, i.e., when it did not have taxable life income.  It is therefore reasonable for the Secretary to continue such prohibitions in the area of consolidated returns, especially in light of Congress' express prohibition against nonlife carrybacks across subgroups.[5]

---

[5]Were we to agree with Plaintiff's argument, life insurance companies that file consolidated returns with nonlife companies would in fact receive a benefit when Congress was not concerned with benefitting life insurance companies.  Whereas life insurance companies that seek to carryback losses to years when they were not life insurance companies

---

sections 812 and 809(d)(4).  Furthermore, section 844 only deals with carryovers.

In view of these carryback prohibitions that to a single life company that files a separate return, the final regulations continue to prohibit the cross-subgroup carryback of a life loss from operations for use against another company's nonlife taxable income, especially since section 1503(c)(1) prohibits the carryback of a nonlife consolidated net operating loss for use against another company's life taxable income.

The final regulation also prohibit the cross-subgroup carryback of capital losses.  The prohibition is consistent with the overall pattern of consolidation suggested by section 1503(c)(1), and by other provisions Internal Revenue Code of 1954, such as sections 804(b)(2) and 818(f)(1).

*Id.* at 11,440.

Prior to the date the regulations were enacted, Congress considered the regulations and spoke to them in the Tax Equity and Fiscal Responsibility Act of 1982 ("TEFRA").  In TEFRA, while Congress did not speak directly to the anti-carryback regulation at issue here, it indicated that it had reviewed the regulations as they were proposed in June of 1982. *See* S. Rep. No. 494, at 344 (1982).  Through TEFRA, Congress left the regulations intact save one provision for which Congress thought further review was necessary; TEFRA therefore delayed implementation of that provision, the "modified phase-by-phase method of calculation" provision, and implemented a "bottom-line" method of calculation provision for two years in order to conduct a review of the regulations proposed by the Secretary. *Id.* However, Congress took no action on the other provisions of the regulations and they were subsequently implemented.

## II.

This case is governed by *Chevron v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984), and its progeny,

which set forth the standard by which the courts are to examine administrative regulations. When a court reviews an agency's construction of the statute it is charged with implementing, the court must first determine whether "Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Id.* at 842-43. If Congress has not directly spoken on the precise issue, however, the court must then determine whether "the agency's answer is based on a permissible construction of the statute." *Id.* at 843. Where Congress has left gaps in legislation to be filled by an administrative agency, the regulations promulgated pursuant thereto are accorded deference. *Id.* at 844. "The Court need not conclude that the agency construction was the only one it permissibly could have adopted to uphold the construction, or even the reading the court would have reached if the question initially had arisen in a judicial proceeding." *Id.* at 843 n.11.

Congress may either explicitly or implicitly delegate rule-making authority to an administrative agency. *Chevron*, 467 U.S. at 843. "If Congress has explicitly left a gap for the agency to fill, there is an express delegation of authority to the agency to elucidate a specific provision of the statute by regulation." *Id.* at 843-44. Such regulations are considered legislative regulations and are given "controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute." *Id.* If, however, the delegation of rule-making authority is implicit, a court must uphold the administrative interpretation of a statutory provision if it is reasonable. *Id.*

Our resolution of this case is also guided by *Wolter Construction Co. v. Commissioner*, 634 F.2d 1029 (6th Cir. 1980), one of the premiere cases in this Circuit discussing the validity of consolidated tax return regulations. While *Wolter* was decided prior to *Chevron*, it is consistent with the principles announced therein and is instructive in this case. The taxpayer in *Wolter* filed a consolidated return under sections 1501 and 1504(a) as an affiliated group. The

that life losses could only be carried back against life insurance company taxable income.[4] *Id.* at 510-11. Since the taxpayer was not a life insurance company within the meaning of section 801 during the relevant carryback years and therefore had no life insurance company taxable income during those years, there could be no offset of the life losses against life income. *Id.* The court stated that "if [the taxpayer] were entitled to apply its 1962 loss from operations to its 1959 income, the loss could, under the statute, be carried undiminished to other taxable years, a result clearly not intended by Congress." *Id.* at 511.

In addition, the Secretary considered the enactment of section 844, which allows an insurance company to carry forward a loss to a year in which its status changed from a life insurance company to a nonlife insurance company or vice versa. 26 U.S.C. § 844. Prior to the enactment of section 844, an insurance company was not permitted to carry forward or carry back losses to a year in which the insurance company's status changed, either from life to nonlife or vice versa. The Secretary thought it significant that Congress, through section 844, allowed the carryforward of losses but did not alter the statute to allow insurance companies to carry back losses to a year when its life status changed. Filing of Life-Nonlife Consolidated Returns, 48 Fed. Reg. at 11,440.; *see also* Appellee's Br. at 23.

After considering the rationale of *Inter-American*, section 844 and other statutes, the Secretary concluded,

[i]n view of these carryback prohibitions that apply to a single life company that files a separate return, the final regulations continue to prohibit the cross-subgroup carryback of a life loss from operations for use against another company's nonlife taxable income, especially since section 1503(c)(1) prohibits the carryback of a

---

[4] Section 812 of the Code is now codified as section 810.

authorized issuance of regulations to deal with "complex problems created by the filing of consolidated returns"). Accordingly, the regulations promulgated pursuant to this authority, in this case the anti-carryback regulation, are legislative in nature and have the force and effect of law. *Conn. Gen. Life Ins. Co. v. Commissioner*, 177 F.3d 136, 143 (3d Cir. 1999); *see also Chevron*, 467 U.S. at 844. We must therefore uphold the anti-carryback regulation unless it is arbitrary, capricious, or manifestly contrary to the Tax Reform Act. *See Chevron*, 467 U.S. at 844; *Conn. Gen.*, 177 F.3d at 146.

First, the anti-carryback regulation is not manifestly contrary to the Tax Reform Act. The purpose of the Tax Reform Act was to ease the hardship imposed on casualty companies by the ban on life-nonlife consolidated income tax returns, while at the same time ensuring that life insurance companies paid taxes approximately equal to their investment income. Because casualty companies were suffering financially, the Act was primarily concerned with allowing those companies the opportunity to offset their losses. The legislative history of the Act indicates that Congress was not at all concerned with the losses of life companies. In fact, as far as we can tell, there is no mention of life losses in the Act or its legislative history. Moreover, the prohibition on the carryback of life losses against nonlife income clearly does not thwart the purpose of the Act inasmuch as it does not place a heavier burden on casualty companies suffering losses than the statutory ban imposed on the carryback of nonlife losses against life income.

Second, the anti-carryback regulation is not arbitrary or capricious. In adopting the anti-carryback regulation, the Secretary relied in part on *Inter-American Life Insurance Co. v. Commissioner*, 56 T.C. 497 (1971), *aff'd*, 469 F.2d 697 (9th Cir. 1972), where the court held that a life insurance company could not carryback losses to a year when it was not a life insurance company within the meaning of section 801. Relying upon section 812(d)(1), which governed the carryback of life losses, the *Inter-American* Court reasoned

taxpayer sought to take a deduction for net operating losses reported by a member of its affiliated group. The Commissioner, however, denied the carryover deductions because the net operating losses that the taxpayer desired to deduct were incurred prior to its affiliation with the member that sustained the losses. *Id.* at 1031. On appeal from the tax court's decision affirming the Commissioner's ruling, the taxpayer argued that the regulation which prohibited the deduction, Treas. Reg. § 1.1502-21(c), was unreasonable and thwarted Congress' intent. *Id.* at 1036.

In resolving the case, the *Wolter* Court noted that

[s]ection 1502 of the Code expressly authorizes the issuance of regulations to deal with the complex problems created by the filing of consolidated returns. This grant of legislative authority insures that "the rules will be written by 'masters of the subject,' *United States v. Moore*, 95 U.S. 760, 763 (24 L. Ed. 588) (1878), who will be responsible for putting the rule into effect." *National Muffler Dealers Ass'n v. United States*, 440 U.S. 472, 477, 99 S. Ct., 1307, 59 L. Ed.2d 519 (1979). Since Congress has delegated to the Secretary of the Treasury the responsibility for formulation of the statutory schema in the area of consolidated returns, any challenge to those regulations bears a greater burden than were the challenge directed at interpretive regulations which could be measured against specific Code provisions.

*Id.* at 1035. After consideration of the regulations and related statutes, the Court noted that "[c]onspicuously absent in the consolidated return area is some constructive guidance from Congress as to the nuts and bolts for computing income of consolidated corporations." *Id.* at 1037. Furthermore, the taxpayer in *Wolter* cited no Tax Code provision with which the regulation conflicted. *Id.* at 1037. Instead, the taxpayer relied on a policy argument it extrapolated from the regulations. *Id.* The Court rejected the taxpayer's argument

and held that the regulation was valid and enforceable. To do otherwise, the Court reasoned,

> would require us to overrule a legislative regulation so as to permit a deduction based only upon a generalized policy distilled from regulations and symbiotic Code provisions. Even if we were to assume that the instant transaction was distinguishable, as a matter of economic reality, from the common parent exception, we would not be required to recognize a claimed deduction for the carryover of [the member's] net operating losses. "The propriety of a deduction does not turn upon general equitable considerations, such [as] a demonstration of effective economic and practical equivalence. Rather, it depends upon legislative grace; and only as there is clear provision therefore can any particular deduction be allowed." Reg. 1.1502-21(c) is a clear expression that a particular deduction is limited, conspicuously absent from the Code is any clear provision which allows the deduction in full.

*Wolter*, 634 F.2d at 1039. The Court continued, "[t]he consolidated return regulations, unlike ordinary Treasury regulations, are legislative in character and have the force and effect of the law. Absent a conflict with the Code, we must sustain the validity of Treas. Reg. § 1.1502-21(c)." *Id.* at 1042.

## III.

Like the regulation in *Wolter*, we conclude that the anti-carryback regulation is a proper exercise of the Secretary's power to promulgate regulations governing consolidated tax returns. The anti-carryback regulation does not conflict with an express provision of the Code or Congress' intent and purpose in enacting the Tax Reform Act. The anti-carryback regulation represents a reasonable interpretation and implementation of the Code and is therefore neither arbitrary, capricious, nor manifestly contrary to the Tax Reform Act.

Plaintiff's argument that the transitional rule necessarily implies that Congress intended to allow the carryback of life losses against nonlife income is equally unavailing. Much like Congress' failure to prohibit the carryback of life losses to nonlife income, the transitional rule does not evince any intent by Congress to allow the carryback of life losses to nonlife income. As the government demonstrated before the district court, there are a number of situations at which the transitional rule could have been directed other than the carryback of life losses against nonlife income. For instance, the transitional rule could affect a chain of corporations where a life company owned a nonlife company which in turn owned another life company, or vice versa. In such a case, the transitional rule would prevent the carryback or carryforward of losses between the first and second life companies (or between two nonlife companies) during the transitional period if there was no chain of includible corporations prior to 1981. Consequently, the existence of the transitional rule does not demonstrate a clear intent by Congress to allow the carryback of life losses to nonlife income.

There is, at best, an ambiguity as to whether Congress intended to allow the carryback of life losses against nonlife income. It is clear, however, that Congress has not directly spoken as to the precise issue regulated by the anti-carryback regulation. Because Plaintiff has failed to point to any language in the statute that expressly allows the carryback of life losses against nonlife income, we apply the *Chevron* rule of deference to the instant case. *See Ohio Periodical*, 105 F.3d at 325.

### B.

In the area of consolidated tax returns, Congress has expressly delegated to the Secretary the authority to promulgate regulations governing the assessment and computation of the tax liability of corporations filing consolidated tax returns. 26 U.S.C. §§ 1502, 1503; *accord Wolter*, 634 F.2d at 1035 (recognizing that Congress

that Congress would have no need to create a transitional rule regarding the carryback of losses if Congress did not intend to allow the carryback of life losses against nonlife income because it had already banned the carryback of nonlife losses against life income. Therefore, Plaintiff contends, Congress' intent to allow the carryback of life losses to nonlife income is clear and the Secretary's regulations in this area are not entitled to deference.

We, however, reject Plaintiff's arguments. First, the contention that Congress' express ban on the carryback of nonlife losses against life income clearly indicates that Congress intended to allow the carryback of life losses against nonlife income is flawed. It is more likely that Congress failed to expressly mention the treatment of life losses because the statute was not concerned with life losses. As the legislative history demonstrates, at the time the statute was written, life insurance companies were almost always profitable.[3] Congress was not concerned about life insurance companies being able to offset their losses. The Act instead was concerned with the hardship that casualty insurance companies had faced because they could not offset their losses against the income of their affiliated life insurance companies. The Act was not directed at or necessarily intended for the benefit of life insurance companies, but rather was intended for the benefit of casualty insurance companies. It could very well be that Congress had no occasion or need to address the treatment of the losses of life insurance companies. Therefore, a conclusion that Congress intended to allow the carryback of life losses to nonlife income does not necessarily flow from its failure to expressly prohibit such a carryback. *Cf. United State v. Mitchell*, 39 F.3d 465, 470 n.6 (4th Cir. 1994); *Health Ins. Ass'n of Am. v. Shalala*, 23 F.3d 412, 423 (D.C. Cir. 1994).

---

[3] Plaintiff too acknowledged that life insurance companies were and are generally profitable, agreeing at oral argument that KCL's situation was an anomaly.

**A.**

In the first instance, we must examine whether Congress has spoken directly on the precise issue at hand--the carryback of life losses to nonlife income. *Ohio Periodical Distribs., Inc. v. Commissioner*, 105 F.3d 322, 325 (6th Cir. 1997). In *Ohio Periodical Distributors*, this Court, in upholding Treas. Reg. § 1.458-1(g) as a reasonable interpretation of section 458 of the Code, concluded that Congress had not spoken to the precise issue presented by Treas. Reg. § 1.458-1(g)--whether a cost of goods adjustment should be properly made under subsection(a). *Id.* In that case, the taxpayer argued that a provision of the Code other than section 458 expressed Congress' intent. The taxpayer therefore claimed that Congress had directly spoken on the precise issue before the Court and that the Secretary's interpretation of section 458 was not entitled to deference. This Court rejected that argument. The Court stated that while the provision noted by the taxpayer was related to the subject matter of the regulation, "there is nothing in that provision that speaks 'to the precise question.'" *Id.* The Court concluded that because the taxpayer had "failed to point to any language in the statute that precludes [the enactment of Treas. Reg. § 1.458-1(g)], taxpayer has failed to demonstrate under *Chevron* that we may not consider the reasonableness of the Commissioner's interpretation of the statute." *Id.*

Like the *Ohio Periodical* Court, we similarly conclude that Congress has not spoken to the precise issue at hand here-- whether life losses may be carried back to nonlife income. A review of section 1503[1] and section 1504[2]

---

[1] Section 1503 provides in pertinent part
(c) Special rule for application of certain losses against income of insurance companies taxed under section 801.--
(1) In general.--If an election under section 1504(c)(2) is in effect for the taxable year and the consolidated taxable income of the members of the group not taxed under section 801 results in a consolidated net operating loss for such taxable year, then under regulations prescribed by the Secretary, the amount of such loss which cannot be absorbed in the applicable carryback periods against the taxable income of such members not taxed under section 801 shall be taken into account in determining the consolidated taxable income of the affiliated group for such taxable year to the extent of 35 percent of such loss or 35 percent of the taxable income of the members taxed under section 801, whichever is less. The unused portion of such loss shall be available as a carryover, subject to the same limitations (applicable to the sum of the loss for the carryover year and the loss (or losses) carried over to such year), in applicable carryover years.
(2) Losses of recent nonlife affiliates.--Notwithstanding the provisions of paragraph (1), a net operating loss for a taxable year of a member of the group not taxed under section 801 shall not be taken into account in determining the taxable income of a member taxed under section 801 (either for the taxable year or as a carryover or carryback) if such taxable year precedes the sixth taxable year such members have been members of the same affiliated group (determined without regard to section 1504(b)(2)).
26 U.S.C. § 1503(c)(1), (2).

[2] Section 1504 provides in pertinent part
(a) Affiliated group defined.--For purposes of this subtitle--
(1) In general.--The term "affiliated group" means--
(A) 1 or more chains of includible corporations connected through stock ownership with a common parent corporation which is an includible corporation, but only if--
* * *
(b) Definition of "includible corporation".--As used in this chapter, the term "includible corporation" means any corporation except--

---

reveal that Congress has not spoken to this precise issue. In fact Congress did not reference how life losses were to be treated at all.

Like the taxpayer in *Ohio Periodical*, Plaintiff argues that Congress has directly spoken on the precise issue of whether life losses can be carried back to nonlife income by failing to expressly prohibit the carryback of life losses to nonlife income while expressly prohibiting the carryback of nonlife losses to life income. Plaintiff argues that Congress had the opportunity to limit the carryback of life losses but chose not to do so and thus expressed its intent to allow such losses. Plaintiff further argues that Congress' intent to allow the carryback of life losses against nonlife income is apparent because Congress placed no express limits on the filing of consolidated returns by life companies except to the extent that Congress established a transitional rule. The transitional rule provided that losses from a year ending prior to January 1, 1981 could not be used in consolidated returns to offset income as carryovers or carrybacks. Tax Reform Act, Pub. L. No. 94-455, § 1507(c)(2). Plaintiff essentially argues

---

(1) Corporations exempt from taxation under section 501.
(2) Insurance companies subject to taxation under section 801.
* * *
(c) Includible insurance companies.--Notwithstanding the provisions of paragraph (2) of subsection (b)--
(1) Two or more domestic insurance companies each of which is subject to tax under section 801 shall be treated as includible corporations for purposes of applying subsection (a) to such insurance companies alone.
(2)(A) If an affiliated group (determined without regard to subsection (b)(2)) includes one or more domestic insurance companies taxed under section 801, the common parent of such group may elect (pursuant to regulations prescribed by the Secretary) to treat all such companies as includible corporations for purposes of applying subsection (a) except that no such company shall be so treated until it has been a member of the affiliated group for the 5 taxable years immediately preceding the taxable year for which the consolidated return is filed.
* * *
26 U.S.C. § 1504(a), (b), (c).